UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICIA KIDWELL-BERTAGNOLLI, et al.,

    Plaintiffs,

   v.

COUNTY OF SONOMA, et al.,

    Defendants.

Case No.  3:20-cv-03291-JSC

**ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 86

  Geoffrey Wise Bertagnolli died September 9, 2019 after jumping from the fifth floor of a parking garage while being detained by Sonoma County Sheriff's deputies pending a 5150 hold. Plaintiffs bring federal and state claims against Sonoma County and Sonoma County Sheriff Deputy Veronica Martinez Ordaz arising from Mr. Bertagnolli's death.  Defendants' motion for summary judgment is now pending before the Court.  (Dkt. No. 86.)  Having considered the parties' briefs and the relevant legal authority, and having had the benefit of oral argument on March 28, 2024, the Court GRANTS the motion for summary judgment on all of the federal claims.  No rational trier of fact could find Deputy Ordaz violated the United States Constitution. And, in any event, Deputy Ordaz is entitled to qualified immunity as there is no clearly established law supporting the unconstitutionality of her conduct.  Further, no reasonable trier of fact could find the County caused Mr. Bertagnolli's death by failing to properly train Deputy Ordaz.

## SUMMARY JUDGMENT EVIDENCE

  Around 1:30 a.m. on September 9, 2019, Sonoma County Sheriff's deputies were dispatched to the Graton Casino in Rohnert Park, California based on a report of a man threatening

to jump off the fifth floor of the parking parage. (Dkt. No. 86-1 at 199.[1]) Deputy Ordaz was the first deputy to arrive and she parked her car on the roof of the parking garage. (Dkt. No. 86-1, Ex. B, Ordaz Depo. at 115:22-116:6.) She observed "several security officers" who pointed her in the direction of the Mr. Bertagnolli and his wife. (*Id*. at 116:4-6.)

The remainder of the incident was captured on Deputy Ordaz's body camera and portions of the body cameras of the other officers on the scene as well as security camera footage. The following summary relies primarily on Deputy Ordaz's body camera (Dkt. No. 86-1, Ex. D-1), the transcript of the body camera footage (Dkt. No. 86-1, Ex. D-2 at ECF 209-261), and photographs from the security cameras on the roof near Deputy Ordaz's vehicle (Dkt. No. 86-2, Ex. L-5 at ECF 32-162).[2]

When Deputy Ordaz arrived at the scene, Mr. Bertagnolli was kneeling on an approximately two-foot concrete ledge at the edge of the roof. (Dkt. No. 86-1, Ex. D-1 at 08:36:28.[3]) There was a woman standing at the ledge holding on to Mr. Bertagnolli—the ledge was slightly above her waist. (*Id*.) As the officers would later learn, the woman was Mr. Bertagnolli's wife, Nikki Kidwell-Bertagnolli. (Dkt. No. 86-1, D-2 at 3:19.) Deputy Ordaz stood several feet from Mr. Bertagnolli and attempted to engage him in conversation asking Mr. Bertagnolli to "sit down" and "how come we are here tonight," and "how can we help you," and "can you talk to me please." (*Id*. at 2:23-4:08.) Mr. Bertagnolli asked for a smoke and Deputy Ordaz got him a pack of cigarettes. (*Id*. at 5:9-20; 8:11-14.)

Deputy Ordaz told Mr. Bertagnolli "Let us all help you. Do you want your wife to see this?" (Dkt. No. 86-1, D-1 at 08:40:38.) Mr. Bertagnolli responded, "It didn't work out like that last time." (*Id*. at 8:40:45; Dkt. No. 86-1, D-2 at 6:5-15.) Ms. Kidwell-Bertagnolli said he tried to run last time and they "choked him out." (Dkt. No. 86-1, D-2 at 8:23-9:10.) Ms. Kidwell-Bertagnolli also said he had overdosed the other day and she gave him CPR. (*Id*. at 11:9-11.)

---

[1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document. When citing to a video, the time indicates the video timestamp.
[2] Plaintiffs did not object to this video evidence or any other evidence proffered by Defendants.
[3] It is unclear why the timestamp of the body camera footage appears to identify the hour with an eight as it is undisputed the incident took place between one and two in the morning.

United States District Court
Northern District of California

Deputy Ordaz continued to ask Mr. Bertagnolli to "have a seat" and to "let me help you" and "don't do this to her." (Dkt. No. 86-1, Ex. D-1 at 08:43:10-08:45:53.)

After about nine minutes, Deputy Keller arrived and began talking with Mr. Bertagnolli. (Dkt. No. 86-1, Ex. B, Ordaz Depo. at 131:10-14; Dkt. No. 86-1, Ex. D-1 at 08:45:55.) Deputy Ordaz stepped away and spoke to Deputy Miale stating Ms. Kidwell-Bertagnolli had already tried to pull Mr. Bertagnolli down several times and Deputy Ordaz was worried he would fall off and to the back. (Dkt. No. 86-1, Ex. D-1 at 08:46:02-08:46:12.) Deputy Miale then began speaking with Mr. Bertagnolli encouraging him to sit down and swing his legs out towards Ms. Kidwell-Bertagnolli so he could really hug her. (*Id.* at 08:48:15-08:58:44.) Throughout Mr. Bertagnolli's time on the ledge, Ms. Kidwell-Bertagnolli held on to Mr. Bertagnolli with Mr. Bertagnolli stroking her hair, rubbing her back, and hugging her. When asked why he was there that night, Mr. Bertagnolli said "drugs" and identified meth, heroin, and crack. (Dkt. No. 86-1, Ex. D-2 at 22:6-13.) While Mr. Bertagnolli swung his legs over the ledge so he was sitting on the ledge facing the officers, after less than three minutes he moved back to kneeling on one leg. (Dkt. No. 86-1, Ex. D-1 at 08:58:44-09:01:27.) Thirty seconds later, as Mr. Bertagnolli pulled away from Ms. Kidwell-Bertagnolli towards the drop, officers successfully moved in to take him off the ledge. (*Id.* at 09:01:27-09:01:56.)

Deputies had talked to Mr. Bertagnolli for 25 minutes before they took him down from the wall. (Dkt. No. 86-1, Ex. D-1 at 08:36:28-09:01:56.) Over this time period, several more deputies, including Sergeant Botttomly, the ranking officer, arrived. (Dkt. No. 86-1, Ex. B, Ordaz Depo. at 143:4-10; Dkt. No. 86-1, Ex. E, Bottomly Depo. 53:24-54:5.) When Sergeant Bottomly observed "an opportunity that [he] could get [his] hands on [Mr. Bertagnolli, he] ran at him" and "bear hugged him and pulled him off the wall." (Dkt. No. 86-1, Ex. E, Bottomly Depo. 76:20-77:3.) Deputy Ordaz does not recall how Mr. Bertagnolli was taken off the wall, "all [she] can remember is people rushing in, grabbing him and then we all kind of went down." (Dkt. No. 86-1, Ex. B, Ordaz Depo. at 145:2-5.) This testimony is consistent with the body camera footage. (Dkt. No. 86-1, Ex. D-1 at 09:01:56-09:02:13.) Mr. Bertagnolli struggled during the few seconds it took deputies to take him off the wall and can be heard saying "I'm not fighting motherfuckers." (*Id.* at

United States District Court
Northern District of California

3

09:01:59-09:02:15)

It took officers less than a minute to handcuff Mr. Bertagnolli during which time Deputies Miale and Ordaz attempted to place his legs in a figure-four hold, another deputy placed a knee on his left shoulder, and a fourth restrained his other arm.  (*Id.* at 09:01:56-09:02:32; Dkt. No. 86-1, Ex. B, Ordaz Depo. at 152:23-153:3.)   After Mr. Bertagnolli was handcuffed, one officer asked him if he was going to kick anyone and when Mr. Bertagnolli said "no," Deputy Ordaz released his leg. (Dkt. No. 86-1, Ex. D-1 at 09:02:40.)  Deputy Ordaz released Mr. Bertagnolli's leg 18 seconds after he was handcuffed. (*Id* at 09:02:32-09:02:50.)  Officers then patted him down and turned him over.  (*Id.* at 09:02:50-09:03:37.)  Less than a minute later, officers stood Mr. Bertagnolli up.  (*Id.* at 09:02:50-09:03:37.) Deputy Ordaz called for medical.  (*Id.* at 09:03:32.) Mr. Bertagnolli asked for a cigarette.  (*Id.* at 09:03:37.)

Deputies Geddes and Ordaz escorted Mr. Bertagnolli to Deputy Ordaz's patrol vehicle and had him sit on the front bumper.  (*Id.* at 09:03:46-09:04:10.)  Deputy Geddes offered Mr. Bertagnolli a cigarette which Deputy Miale lit for him. (*Id.* at 09:04:10-09:05:19.)  Deputy Ordaz asked Mr. Bertagnolli if he was on meth or heroin and Mr. Bertagnolli responded that he had smoked meth 24 hours ago.  (*Id.* at 09:06:10.)  Deputy Miale asked Mr. Bertagnolli if this was him "trying to get out of the game." (*Id.* at 09:06:33.)  Mr. Bertagnolli's response is not audible. Paramedics then approached Mr. Bertagnolli and he said "I don't need all that."  (*Id.* at 09:07:55.) Another officer approached Deputy Ordaz and asked if she was going to 5150 Mr. Bertagnolli and she said "yes."  (*Id.* at 09:08:08.)  The paramedic asked Mr. Bertagnolli if he "got hurt when he was tackled," and he responded "no."  The paramedic followed-up: "are you sure you aren't injured," and he said "no."  (*Id.* at 09:08:11-09:08:44.)  The paramedic then said, "I don't need to do paperwork on him.  He's not injured."  (*Id.* at 09:08:44-09:08:50.)  Deputy Ordaz asked Mr. Bertagnolli "are you sure you don't want them to check you out" and he again said "no."  (*Id.* at 09:08:55-09:08:58.)  The paramedics walked away.

Deputy Ordaz then told Mr. Bertagnolli she needed to check his handcuffs.  (*Id.* at 09:09.00.)  Deputy Ordaz told Mr. Bertagnolli she wanted to "put him back here" and escorted him to the driver side of her vehicle.  (*Id.* at 09:09:40.)  Deputy Ordaz had her hand on the inside

United States District Court
Northern District of California

of Mr. Bertagnolli's elbow.  (*Id.* at 09:09:54.)  Mr. Bertagnolli asked if he could see his wife and Deputy Ordaz said yes, once she got him into the back of her patrol car and searched him then Ms. Kidwell-Bertagnolli could come give him a hug and a kiss.  (*Id.* at 09:09:43-09:09:51.)  Deputy Ordaz advised Mr. Bertagnolli she needed to search him because she was putting him in her car.  (*Id.* at 09:09:55.)  Mr. Bertagnolli then said he wanted to give Ms. Kidwell-Bertagnolli a hug.  (*Id.* at 09:10:08.)

The rest of the incident is difficult to see on Deputy Ordaz's body camera.  The body camera shows Deputy Ordaz patting Mr. Bertagnolli down near the rear driver side door of her vehicle.  (*Id.* at 09:09:54.)  The body camera then shows Deputy Ordaz attempting to open the driver side rear door with her left hand, but it was locked.  (*Id.* at 09:10:06.)  Deputy Ordaz testified, and the security camera footage shows, while Deputy Ordaz was holding Mr. Bertagnolli's inside bicep with her right hand, she reached forward with her other hand to open the front driver's door.  (Dkt. No. 86-1, Ex. B, Ordaz Depo. at 219:25-220:13; Dkt. 86-2, Ex. L5, Sec. Camera footage at 73,661-73,756.)  It is disputed how tightly Deputy Ordaz was holding Mr. Bertagnolli's arm at this point.  The video clearly shows as soon as Deputy Ordaz reached for the driver-side front door, Mr. Bertagnolli broke loose and began running around the rear of her vehicle.  (Dkt. No. 86-1, Ex. B, Ordaz Depo. at 223:1-9; Dkt. No. 86-1, Ex. D-1 at 09:10:10; Dkt. 86-2, Ex. L5 at 109.)  Deputy Ordaz began to run after him. (Dkt. No. 86-1, D-1 at 09:10:10.)  Several other deputies gave chase, but no one caught Mr. Bertagnolli before he jumped over the ledge.  (Dkt. No. 86-1, Ex. B, Ordaz Depo. 232:20-233:6.)  Three seconds elapsed from when he broke free from Deputy Ordaz to when he jumped over the ledge. (Dkt. No. 86-1, Ex. D-1 at 09:10:10-09:10:13.)

**PROCEDURAL BACKGROUND**

Eight months after the incident, Ms. Kidwell-Bertagnolli and Mr. Bertagnolli's parents, Dwayne Bertagnolli and Jane Besaw, filed this wrongful death action against the County of Sonoma, the Sonoma County Sheriff's Office, Sheriff Mark Essick, and Deputy Veronica Martinez Ordaz.  Plaintiffs' Second Amended Complaint pleads 13 claims for relief, including Section 1983 Fourth and Fourteenth Amendment claims, and various state law claims.  (Dkt. No.

37.)  Defendants move for summary judgment on each of these claims.  (Dkt. No. 86.)

## EVIDENTIARY OBJECTIONS

On reply, Defendants raise evidentiary objections to the declarations and reports of Plaintiffs' experts Mr. Obayashi and Dr. Watchel, which Plaintiffs submitted in opposition to the motion for summary judgment.  (Dkt. No. 94 at 24.)  For the most part, the objected to evidence is not material to the Court's decision and it is thus unnecessary to resolve Defendants' objections. To the extent this Order discusses portions of Mr. Obayashi's declaration, Defendants' objections are addressed in context.

## DISCUSSION

"Summary judgment is proper where the movant shows, by citation to the record, that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021). The Court "view[s] the facts in the light most favorable to the nonmoving party." *Id*. (quoting *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019) (per curiam)).

## I.    SECTION 1983 CLAIMS

Plaintiffs bring Section 1983 claims against Deputy Ordaz based on the Fourth Amendment for excessive force, integral participation, failure to intervene, and denial of medical care, and the Fourteenth Amendment for failure to protect from harm and denial of substantive due process, as well as a municipal liability claim against the County of Sonoma and Sheriff Essick.[4] (Dkt. No. 37.)   Defendants insist summary judgment is required on all of Plaintiffs' Section 1983 claims because (1) there was no underlying constitutional violation; and (2) Deputy Ordaz is entitled to qualified immunity.

The Court thus first "ask[s] whether the facts, viewed in the light most favorable to the plaintiff, demonstrate that [Ordaz] violated a constitutional right." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022). Then, the Court asks "whether that right was 'clearly established' at the time

---

[4] Plaintiffs named Sheriff Essick in his individual capacity, but it is undisputed he had no personal involvement in the incident. (Dkt. No. 37 at ¶ 10.)  So, he is entitled to summary judgment on all claims in this lawsuit.

United States District Court
Northern District of California

of the alleged constitutional violation." *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).

### A.   Fourth Amendment Excessive Force Claim

#### 1.   Existence of a Constitutional Violation

Plaintiffs contend Deputy Ordaz used excessive when she continued to hold Mr. Bertagnolli's leg for 18 seconds after he was handcuffed.  "In evaluating a Fourth Amendment claim of excessive force, [courts] ask whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Rice v*. Morehouse, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). The "analysis must balance the nature of the intrusion upon an individual's rights against the countervailing government interests at stake, without regard for the officers' underlying intent or motivations." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019). Courts consider the totality of the circumstances, including "(1) the 'severity of the crime at issue,' (2) whether the suspect 'poses an immediate threat to the safety of the officers or others,' and (3) whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.'" *Peck*, 51 F.4th at 887 (quoting *Graham*, 490 U.S. at 396). Courts also consider "the availability of less intrusive alternatives to the force employed and whether warnings were given." *Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023). Of the factors, "the 'immediate threat to safety' factor is the most important." *Peck*, 51 F.4th at 877. However, the Court "must ultimately consider the totality of the circumstances 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). Therefore, "[o]nly information known to the officer at the time the conduct occurred is relevant." *S.R. Nehad*, 929 F.3d at 1132.

#### a.   Severity of the Crime at Issue

"The 'character of the offense' committed by the suspect is also 'often an important consideration in determining whether the use of force was justified.'" *Glenn v. Washington Cnty.*, 673 F.3d 864, 874 (9th Cir. 2011) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)).  Defendants contend they had probable cause to detain Mr. Bertagnolli on a 5150 hold.

"Under section 5150, an officer may detain any person the officer determines, 'as a result

United States District Court
Northern District of California

1   of mental disorder, is a danger to others, or to himself or herself, or gravely disabled.'" *Bias v.*

2   *Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007) (quoting Cal. Welf. & Inst. Code § 5150). Cal.

3   Welf. & Inst. Code § 5150. If such a determination is made, the officer may place the person at a

4   county-designated facility for a "72–hour treatment and evaluation." Cal. Welf. & Inst. Code §

5   5150. The officer's determination must be based on probable cause. *Id.*

6        Probable cause exists under Section 5150 if facts are known to the officer "that would lead

7   a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the

8   person detained is mentally disordered and is a danger to himself or herself." *People v. Triplett*,

9   144 Cal.App.3d 283, 288 (1983). To justify the detention, the officer must point to "specific and

10  articulable facts which, taken together with rational inferences from those facts, reasonably

11  warrant his or her belief or suspicion." *Id.* "Each case must be decided on the facts and

12  circumstances presented to the officer at the time of the detention and the officer is justified in

13  taking into account the past conduct, character, and reputation of the detainee." *Id.* (citation

14  omitted). An officer "is not required to make a medical diagnosis of mental disorder," rather

15  "generally, mental disorder might be exhibited if a person's thought processes, as evidenced by

16  words or actions or emotional affect, are bizarre or inappropriate for the circumstances." *Id.*

17  Whether probable cause exists is evaluated through the eyes of the officer on the scene at the time

18  of the incident and can incorporate the officer's prior training and experience. *United States v.*

19  *Fouche*, 776 F.2d 1398, 1403 (9th Cir. 1985).

20        In this case, dispatch informed officers there was a man who wanted to jump off the fifth

21  floor of the Graton Casino parking garage. (Dkt. No. 86-1 at 199.) Officers attempted to get Mr.

22  Bertagnolli to come down off the ledge for 25 minutes before moving in and removing him from

23  the ledge. (Dkt. No. 86-1, Ex. D-1 at 08:36:28-09:01:56.) Viewing all this evidence in the light

24  most favorable to Plaintiffs, no reasonable trier of fact could conclude officers lacked probable

25  cause to place Mr. Bertagnolli on a 5150 hold. *See Bias*, 508 F.3d at 1221 ("Based on the

26  [officer's] observations and circumstances, it was not unreasonable for Officer Moynihan to

27  conclude on May 14, 2003, that Ms. Bias might be a threat to herself or to others due to a mental

28  disorder. Thus, he had probable cause to detain Ms. Bias under section 5150.") Plaintiffs do not

1    contend otherwise.

2                    **b.      Threat Posed by Mr. Bertagnolli**

3          Drawing inferences in Plaintiffs' favor, the threat posed by Mr. Bertagnolli after he was

4    handcuffed was low.  While officers may have been concerned for Ms. Kidwell-Bertagnolli's

5    safety while he was on the ledge and she was holding on to him, once Mr. Bertagnolli was

6    removed from the wall and handcuffed, he posed no further threat to her.  Mr. Bertagnolli,

7    however, remained a threat to himself and to the officers until officers had fully secured him.  By

8    definition, a Section 5150 detention means a person is a danger to himself or others.  *See* Cal.

9    Welf. & Inst. Code § 5150; S.B., 864 F.3d at 1011; *Bias*, 508 F.3d at 1222. Mr. Bertagnolli could

10   have attempted to run (as he later did) or kick at the officers, and thus presented at least a low

11   threat even when handcuffed.

12                   **c.      Whether Mr. Bertagnolli Was Actively Resisting Arrest**

13         Mr. Bertagnolli struggled when officers removed him from the wall; however, a reasonable

14   trier of fact could find he did not resist once handcuffed.

15                   **d.      The Availability of Less Intrusive Means**

16         Plaintiffs do not address this factor. "The calculus of reasonableness must embody

17   allowance for the fact that police officers are often forced to make split-second judgments—in

18   circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

19   necessary in a particular situation." *Graham*, 490 U.S. at 396–97. So, "[o]fficers need not avail

20   themselves of the least intrusive means of responding to an exigent situation; they need only act

21   within that range of conduct we identify as reasonable." *Glenn v. Washington Cnty*., 673 F.3d 864,

22   876 (9th Cir. 2011).  Clear, reasonable, and less intrusive alternatives to the force employed

23   weighs against a finding that the use of force was reasonable. *Id.*   "[T]he Fourth Amendment does

24   not require a police officer to use the least intrusive method of arrest." *Tatum v. City & Cnty. of

25   San Francisco*, 441 F.3d 1090, 1098 (9th Cir. 2006).

26         Plaintiffs appear to argue that no force other than handcuffing was reasonable once Mr.

27   Bertagnolli was handcuffed; so, this factor does not play a role in the analysis.

28

United States District Court
Northern District of California

9

### e.      The Totality of the Circumstances

Drawing all reasonable inferences in Plaintiffs' favor, no reasonable trier of fact could find Deputy Ordaz's holding Mr. Bertagnolli's leg for 18 seconds after he was handcuffed was an unreasonable use of force.

In *Tatum*, an officer saw the plaintiff kicking the door of a police station. 441 F.3d at 1092. The officer yelled at him to stop, but the decedent ignored him.  *Id*. at 1092.  "Based on [the decedent's] odd behavior, as well as his bloodshot eyes, heavy perspiration, and slurred speech, [the officer] suspected that [the decedent] might be intoxicated or under the influence of a controlled substance."  *Id*. at 1093.  The officer warned the decedent he would be arrested if he did not stop kicking the door.  The decedent still did not respond. After again warning the decedent he would be handcuffed if he did not stop and getting no response, the officer placed him in an arm control hold and attempted to apply handcuffs.  *Id*.  The decedent resisted and the officer called for backup and took him to the ground.  *Id*.  When the officers arrived, they were able to handcuff him.  *Id*.  The decedent lay on his stomach for about a minute after he was handcuffed and then officers placed him on his side.  *Id*.  After two minutes officers noticed the decedent's breathing was labored and called an ambulance.  *Id*.  When paramedics arrived 10 minutes later, he was no longer breathing and was pronounced dead.  It was later determined he died of cocaine toxicity. *Id.*

The Ninth Circuit concluded

> it was objectively reasonable for the officers to position Fullard on his stomach for approximately ninety seconds. Officer Smith testified that Fullard kicked and struggled throughout the officers' efforts to secure him in handcuffs. The officers needed to incapacitate Fullard, both to protect themselves and to protect him. As the district court noted, the summary judgment record did not contain evidence that any officer applied crushing pressure to Fullard's back or neck as he lay prone. The evidence is unequivocal that Fullard lay on his stomach at most for just over a minute, after which Officers Smith and Chan positioned him on his side. Tatum has not cited any authority to support her argument that simply laying a suspect on his stomach can constitute excessive force, and we have found none.

*Id*. at 1098.  So too here.  Given the totality of circumstances presented to officers, drawing reasonable inferences in Plaintiffs' favor, it was objectively reasonable for Deputy Ordaz to continue to hold Mr. Bertagnolli's leg for 18 seconds after he was handcuffed.  Mr. Bertagnolli initially resisted, and while that resistance ended once he was handcuffed, the officers needed to

United States District Court
Northern District of California

1   ensure they had control over him so he was not a danger to himself or the officers.  There is no

2   evidence Deputy Ordaz's holding of Mr. Bertagnolli's leg injured him in any way, so the force

3   used was minimal.  And Deputy Ordaz released Mr. Bertagnolli's leg after he confirmed he was

4   not going to kick anyone.  As in *Tatum*, given the facts here, Deputy Ordaz's use of force was

5   objectively reasonable.  *Id*. at 1098; *see also Arpin v. Santa Clara Valley Transp. Agency*, 261

6   F.3d 912, 922 (9th Cir. 2001) ("Because Arpin failed to meet her burden of proof of providing

7   specific facts to show that the force used was unreasonable or that she sustained actual injuries, the

8   district court did not err in granting summary judgment to the County Defendants on Arpin's

9   claim of unreasonable force.").

10      Plaintiffs' reliance on *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052,

11   1057 (9th Cir. 2003), to argue otherwise is unpersuasive.  In *Drummond*, two officers brought to

12   the ground an unarmed man whom they knew suffered from mental illness.  *Id*. at 1054. Although

13   the man "offered no resistance," the officers continuously applied their weight to his neck and

14   upper torso. *Id*. The man repeatedly told the officers he could not breathe, and he soon fell into

15   respiratory distress, eventually losing consciousness. *Id*. at 1054–55.  *Drummond* held the force

16   allegedly used by the officers "was severe and, under the circumstances, capable of causing death

17   or serious injury" and the *Graham* factors for assessing force "would have permitted the use of

18   only minimal force once Drummond was handcuffed and lying on the ground." *Id*. at 1056, 1058.

19   While "some force was surely justified in restraining Drummond so that he could not injure either

20   himself or the arresting officers," "after he was handcuffed and lying on the ground, the force that

21   the officers then applied was clearly constitutionally excessive when compared to the minimal

22   amount that was warranted." *Id*. at 1059.   The Ninth Circuit concluded "[t]he officers—indeed,

23   any reasonable person—should have known that squeezing the breath from a compliant, prone,

24   and handcuffed individual despite his pleas for air involves a degree of force that is greater than

25   reasonable." *Id*.

26      Plaintiffs insist the use of force here—continuing to hold Mr. Bertagnolli's leg "for at least

27   30 seconds" after Mr. Bertagnolli was handcuffed—exceeds the minimal force allowed under

28   *Drummond*.  (Dkt. No. 91 at 19.)  Plaintiffs argue "the length of time is not determinative."  (*Id*.)

11

United States District Court
Northern District of California

1    While the nature of the crime, severity of the threat, and resistance here parallel *Drummond*, the

2    force used does not.  In *Drummond*, the officers continuously applied their weight to the plaintiff's

3    neck and upper torso, while he "repeatedly told the officers that he could not breathe and that they

4    were choking him." 343 F.3d at 1054-55.  Approximately 20 minutes after he was taken to the

5    ground, officers bound his ankles, and one minute later Drummond went limp, lost consciousness,

6    and fell into a permanent vegetative state.  *Id*. at 1055.  Here, in contrast, it took less than a minute

7    for officers to handcuff Mr. Bertagnolli during which time Deputy Ordaz held one of his legs.

8    (Dkt. No. 86-1, D-1 at 09:01:56- 09:02:32.)  It is undisputed Deputy Ordaz was not the officer

9    who placed a knee on Mr. Bertagnolli's back.  Rather, after he was handcuffed, Deputy Ordaz

10   continued to hold on to his leg for 18 seconds before other officers conducted a pat down. (*Id* at

11   09:02:32-09:02:50.)  And, unlike *Drummond*, there is nothing in the record that supports a finding

12   Mr. Bertagnolli was in any way injured by Deputy Ordaz holding his leg.  Her use of force is not

13   akin to that in *Drummond*.

14        The other cases Plaintiffs rely on are likewise inapposite.  *See Zelaya v. Las Vegas Metro.*

15   *Police Dep't*, 682 F. App'x 565, 567 (9th Cir. 2017); *Abston v. City of Merced*, 506 F. App'x 650,

16   652 (9th Cir. 2013); *Garcia v. Yuba Cnty. Sheriff's Dep't*, No. 2:19-CV-02621-KJM-DB, 2023

17   WL 3124398, at *8 (E.D. Cal. Apr. 27, 2023))[5]; *Garlick v. Cnty, of Kern*, 167 F.Supp.3d 1117

18   (E.D. Cal. 2016).  Unlike here, each of these cases—each of which involved compression

19   asphyxia and/or prolonged application of bodyweight—resulted in claims of injury or death.

20        In *Zelaya*, the Ninth Circuit concluded the district court erred in granting summary

21   judgment because a reasonable jury could find the officer's use of force objectively unreasonable

22   when video of the incident showed the plaintiff motionless and unresisting for more than 90

23   seconds while officers continued to pin him to the ground with their body weight and bend his legs

24   toward his torso, causing his death.  682 F. App'x at 567.  In *Abston*, another case in which the

25   officers' use of force resulted in a death, the Ninth Circuit similarly concluded "[a] reasonable

26   fact-finder could conclude that defendants' use of body compression [for at least one minute thirty

27

28   _____
     [5] The Court assumes this is the case Plaintiffs reference in their brief, although no cite was
     provided.  (Dkt. No. 91 at 19.)

seconds] as a means of restraint was unreasonable and unjustified by any threat of harm or escape when Abston was handcuffed and shackled, in a prone position, and surrounded by numerous officers." 506 F. App'x at 652.   In *Garcia*, the court held a reasonable jury could find the force excessive when the four officers applied body-weight pressure for over two minutes to keep the decedent on the ground when he was prone and handcuffed in a distressed state, leading to his death. 2023 WL 3124398, at *8.  In *Garlick*, the decedent was "restrained and prone on the ground for approximately eight to ten minutes with four officers applying body-weight pressure to his back." 167 F.Supp.3d at 1155.

At oral argument, Plaintiffs relied heavily on language from *Galick* that the critical question was "the risk of injury."  *Garlick*, however, was discussing the definition of *lethal* force in light of *Drummond* and noted "[t]he conduct need not have actually caused serious injury or death to be considered lethal force; it is the risk of that result that turns the screw." *Id*.  Plaintiffs, however, have offered no evidence of a serious risk of harm from Deputy Ordaz's 18 second leg hold.  Indeed, in contrast to each of these cases which involved death or serious injury, there is no evidence of any injury to Plaintiff from the alleged excessive force.  Mr. Bertagnolli himself repeatedly denied injury and can be seen on the body camera footage walking to Deputy Ordaz's car and sitting on the bumper smoking a cigarette. Plaintiffs' expert Mr. Obayashi testified Mr. Bertagnolli did not suffer any injury and he did not "go into medical distress."  (Dkt. No. 94-1, Obayashi Depo. at 49:19-50:14; 52:7-13.)

No reasonable trier of fact could find Deputy Ordaz's 18-second hold of Mr. Bertagnolli's leg was more than minimal force.  Indeed, Plaintiffs' own expert Mr. Obayashi testified Deputy Ordaz's actions did not amount to excessive force.  (Dkt. No. 94-1, Obayashi Depo. at 42:3-4.)

*** 

In sum, drawing all reasonable inferences from the record in Plaintiffs' favor, no reasonable trier of fact could find Deputy Ordaz used constitutionally excessive force.  However, even if a reasonable trier of fact could find excessive force was used, qualified immunity bars Plaintiffs' Fourth Amendment excessive force claim for the reasons described below.

### 2.      Qualified Immunity

"The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct." *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991); s*ee also Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023) ("Plaintiffs asserting excessive force claims must thus point to an existing rule that 'squarely governs' the facts at issue.") (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)). "The 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022) (quoting *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (per curiam)). Moreover, "[i]n the Fourth Amendment excessive force context, specificity is especially important, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Ventura v. Rutledge*, 978 F.3d 1088, 1091 (9th Cir. 2020) (cleaned up).  "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (cleaned up). While case law directly on point is not required for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. at 7-8.

Plaintiffs contend that in light of *Drummond*, every reasonable law enforcement officer would understand "the type of force officers applied to Mr. Bertagnolli" was excessive.[6]  (Dkt. No. 91 at 21.)   Specifically, Plaintiffs contend *Drummond* established compression asphyxia is excessive.  But there is no evidence that would permit a trier of fact to find any officer—let alone Deputy Ordaz—used force which amounted to compression asphyxia on Mr. Bertagnolli. Moreover, even construing *Drummond* more broadly regarding the type of force it deemed excessive, it did not clearly establish that continuing to hold Mr. Bertagnolli's leg for 18 seconds after he was handcuffed was excessive.  Because Plaintiffs identify no case clearly establishing Deputy Ordaz's conduct amounted to excessive force, they have failed to shoulder their burden

---

[6] Plaintiffs also rely on *Perkins v. Edgar*, No. 21-55552, 2022 WL 14476272, at *1 (9th Cir. Oct. 25, 2022), which post-dates the incident and like *Drummond* involves "compression asphyxia."

1    and Deputy Ordaz is entitled to qualified immunity. *See Shafer v. Cnty. of Santa Barbara*, 868

2    F.3d 1110, 1118 (9th Cir. 2017).

3        **B.      Fourth Amendment Integral Participant and Failure to Intervene Claims**

4        Plaintiffs also contend Deputy Ordaz is liable as an integral participant in and for failure to

5    intervene in the other deputies' excessive force.  Plaintiffs do not dispute the reasonableness of the

6    force used to bring Mr. Bertagnolli to the ground or handcuff him; instead, they focus on what

7    they characterized at oral argument as the 30-seconds following the handcuffing when officers

8    remained in the "dog pile."

9        Liability under an integral participation theory is appropriate if an officer has some

10   fundamental involvement in the conduct that caused the constitutional violation. *See Nicholson v.*

11   *City of L.A.*, 935 F.3d 685, 691-92 (9th Cir. 2019). Similarly, so long as the officer has a

12   reasonable opportunity to intercede, law enforcement officers have a duty to intercede when their

13   fellow officers are violating the constitutional rights of others. *See Tobias v. Arteaga*, 996 F.3d

14   571, 583-84 (9th Cir. 2021).  Under the integral participation theory, liability arises in

15           two situations: those in which (1) the defendant knows about and
16           acquiesces in the constitutionally defective conduct as part of a
             common plan with those whose conduct constitutes the violation or
17           (2) the defendant set[s] in motion a series of acts by others which [the
             defendant] knows or reasonably should know would cause others to
18           inflict the constitutional injury.

19    *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022) (cleaned up; alterations in original).

20       Plaintiffs appear to contend Deputy Ordaz's liability arises under the first scenario; that is,

21   Deputy Ordaz
             participated in the pinning down of Bertagnolli face down while,
22           holding one leg, while her fellow officers had: (1) a knee in his back;
             (2) his other leg bent in a figure four hold, and (3) another was holding
23           him down.  There were at least four officers holding him, pinned face
             down—and he was not resisting, as he managed to scream out.

24   (Dkt. No. 91 at 20.)  It is undisputed this portion of the incident lasted 30 seconds or less.  At oral

25   argument, Plaintiffs insisted Deputy Ordaz should have intervened to stop the dogpile and tell

26   Deputy Edwards, who had his knee on Mr. Bertagnolli's shoulder, to remove it after just five

27   seconds.

28       Plaintiffs' theory does not identify a constitutional violation for several reasons.  First,

United States District Court
Northern District of California

1   there is no evidence to support a five-second rule: the record does not support a finding it is based

2   on Sonoma County Sherriff's policy or law enforcement best practices generally.  Second,

3   Plaintiffs cite no caselaw which supports the proposition officers must immediately release an

4   individual they have probable cause to hold on a 5150 once the individual is handcuffed.  To the

5   contrary, under *Drummond*, the officers were allowed to use some amount of force "so that [Mr.

6   Bertagnolli] could not injure either himself or the arresting officers." *Drummond*, 343 F.3d at

7   1059.  On the body camera, one of the officers can be heard asking Mr. Bertagnolli immediately

8   after he was handcuffed whether he was going to kick anyone; when he responded no, the officers

9   released him.  Finally, as discussed above in the context of the claim alleging Deputy Ordaz

10   engaged in excessive force, Plaintiffs have not offered evidence that as in *Drummond*, *Garlick*, or

11   any of the other cases, the officer with his knee on Mr. Bertagnolli's back continued to place

12   pressure on Mr. Bertagnolli's shoulder following the handcuffing.  Deputy Edwards testified to the

13   contrary.  (Dkt. No. 86-1, Ex. F, Edwards Depo. 89:6-14 (testifying he was sitting on his heels

14   "where the majority of the pressure is" and once he got Mr. Bertagnolli's arm behind his back

15   "there was basically no pressure.").)  Further, Mr. Bertagnolli did not complain about the pressure

16   on his back, indicate he had difficulty breathing, or complain of any injury following the incident.

17   And, there is no evidence of any injury. This too distinguishes the officers' conduct from the cases

18   on which Plaintiffs rely.

19         Even if a reasonable trier of fact could find Deputy Ordaz should have intervened or was

20   an integral participant in the excessive force, she would be entitled to qualified immunity.

21   Plaintiffs have identified no case other than *Drummond* and it does not clearly establish Deputy

22   Ordaz was an integral participant in excessive force or required to intervene to tell her fellow

23   officer to remove his knee from Mr. Bertagnolli's back in the seconds after he was handcuffed.

24   Plaintiffs have therefore failed to shoulder their burden and Deputy Ordaz is entitled to qualified

25   immunity. *See Shafer*, 868 F.3d at 1118.

26       **C.**     **Fourth Amendment Denial of Medical Care Claim**

27         The SAC alleges Deputy Ordaz failed to provide Mr. Bertagnolli medical care in violation

28   of his Fourth Amendment rights.  (Dkt. No. 37 at ¶¶ 122-135.)  To the extent Plaintiffs contend in

United States District Court
Northern District of California

1  their opposition the claim arises under the Fourteenth Amendment instead, they cannot amend the

2  claim on summary judgment.  *See Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292 (9th Cir.

3  2000).

4       "[A] police officer who promptly summons the necessary medical assistance has acted

5  reasonably for purposes of the Fourth Amendment." *Tatum v. City & Cnty. of San Francisco*, 441

6  F.3d 1090, 1099 (9th Cir. 2006).  Plaintiffs appear to contend Deputy Ordaz failed to provide the

7  necessary medical assistance because she failed to summon "mental health assistance."  (Dkt. No.

8  91 at 22.)  Plaintiffs, however, do not explain what they mean by "mental health assistance" nor

9  do they provide any evidence the Sonoma County Sheriff's Office, law enforcement practices, or

10 anything else would require officers to summon specialized mental health treatment before

11 transferring an individual for evaluation on a 5150 hold.  To the contrary, Sonoma County

12 Sheriff's Office Policy 409 provides "[a] deputy responding to a call involving a person in crisis

13 should" among other things "[r]equest available backup deputies and specialized resources as

14 deemed necessary, and if it is reasonably believed that the person is in a crisis situation, use

15 conflict resolution and de-escalation techniques to stabilize the incident as appropriate."  (Dkt. No.

16 91-3 at 13.)  While Plaintiffs insisted at oral argument that Deputy Ordaz should have summoned

17 a crisis intervention team, there is no evidence in the record such a team exists.  Plaintiffs' police

18 practices expert Mr. Obayashi attests "the Sonoma County Sherriff's Office had a formal

19 partnership with the county's Mental Health agency to address this very issue," but Plaintiffs do

20 not identify evidence to support this statement.  (Dkt. No. 91-3, Obayashi Decl. at ¶ 6.)  Indeed,

21 the Sonoma County Sheriff's crisis intervention policy does not discuss a crisis intervention team,

22 let alone mandate Deputy Ordaz summon the team based on the circumstances here.  (Dkt. No. 91-

23 3 at 13 (referencing "specialized resources" without explanation).)

24      Even if a reasonable jury could find Deputy Ordaz failed to provide necessary mental

25 health assistance, she would be entitled to qualified immunity.  Plaintiffs identify no case clearly

26 requiring officers to summon specialized mental health treatment providers when dealing with an

27 individual in mental health crisis before taking the individual to the hospital on a 5150 hold.  The

28 only case Plaintiffs cite is *Drummond*, but it was an excessive force case and did not address a

1   Fourth Amendment denial of medical care claim.  *See Drummond*, 343 F.3d at 1062.  Without

2   such a case, Plaintiffs have failed to shoulder their burden and Deputy Ordaz is entitled to

3   qualified immunity. *See Shafer*, 868 F.3d at 1118.

### D.      Fourteenth Amendment Failure to Protect Claim

5       Plaintiffs next contend Deputy Ordaz was deliberately indifferent to Mr. Bertagnolli's

6   serious medical needs.

> [T]he elements of a pretrial detainee's medical care claim against an
> individual defendant under the due process clause of the Fourteenth
> Amendment are: (i) the defendant made an intentional decision with
> respect to the conditions under which the plaintiff was confined; (ii)
> those conditions put the plaintiff at substantial risk of suffering
> serious harm; (iii) the defendant did not take reasonable available
> measures to abate that risk, even though a reasonable official in the
> circumstances would have appreciated the high degree of risk
> involved – making the consequences of the defendant's conduct
> obvious; and (iv) by not taking such measures, the defendant caused
> the plaintiff's injuries.

13  *Gordon v. Cnty. of Orange* ("*Gordon I*"), 888 F.3d 1118, 1125 (9th Cir. 2018).  For the third

14  element, "the defendant's conduct must be objectively unreasonable." *Id.* (quotation marks and

15  citation omitted).

16      Plaintiffs contend Deputy Ordaz acted with deliberate indifference to Mr. Bertagnolli's

17  safety because her "questioning of Bertagnolli regarding his suicidality was (at best) inappropriate

18  and had exacerbated Bertagnolli's suicidality" plus she "participated in the use of excessive

19  force." (Dkt. No. 91 at 23.)  Then "she about-faced with the more lenient treatment and finally let

20  him go/marginally restrained him." (*Id.* at 24.)  Plaintiffs' expert attests the "vacillating and

21  volatile treatments heightened his own suicidal ideations, of the fickle and uncertain nature of life

22  and so forth…[and] exacerbated his suicidality." (Dkt. No. 91-4, Wachtel Decl. at ¶ 4.)

23      Even if drawing all inferences in Plaintiffs' favor, a reasonable trier of fact could find

24  Deputy Ordaz's conduct was objective unreasonable, she would be entitled to qualified immunity.

25  Plaintiffs identify no case holding an officer was deliberately indifferent to an individual's serious

26  medical needs based on how the officer spoke with the individual having the mental health crisis,

27  let alone clearly established law so holding.  The same absence of law exists holding officers

28  deliberately indifferent because they were too lax in their restraints of an individual.  Plaintiffs

United States District Court
Northern District of California

have thus failed to shoulder their burden and Deputy Ordaz is entitled to qualified immunity. *See Shafer*, 868 F.3d at 1118.

### E.    Substantive Due Process Claim

The Due Process Clause of the Fourteenth Amendment provides a State may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has held Fourteenth Amendment guarantees "certain substantive rights." *Peck v. Montoya*, 51 F.4th 877, 892 (9th Cir. 2022) (citing *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)). The Ninth Circuit has interpreted these substantive rights to include parents' right "to the companionship of a child, which a police officer violates by 'act[ing] with a purpose to harm' the child 'that [is] unrelated to legitimate law enforcement objectives.'" *Johnson v. Bay Area Rapid Transit Dist*., 724 F.3d 1159, 1168–69 (9th Cir. 2013) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).

"To determine whether a violation of substantive due process occurred, we look to whether the officers' conduct deprived [Plaintiffs] of [their] familial interest in a manner that 'shocks the conscience.'" *Peck*, 51 F.4th at 893 (quoting *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013)). "There are two tests used to decide whether officers' conduct 'shocks the conscience.'" *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022). Determining "[w]hich test applies turns on whether the officers had time to deliberate their conduct." *Id*. The "deliberate indifference" standard applies "if the situation at issue 'evolve[d] in a time frame that permits the officer to deliberate before acting.'" *Id*. (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). A different test applies to situations "that escalate so quickly that the officer must make a snap judgment." *Porter*, 546 F.3d at 1137. In those cases, the "purpose to harm" standard applies. "Whether evaluated under the deliberate-indifference test or the purpose-to-harm test," Plaintiffs cannot simply "assert Fourth Amendment rights through a Fourteenth Amendment claim. Instead, they must show more: not just that the officers' actions were objectively unreasonable and thus violated [Plaintiff's] Fourth Amendment rights, but that the officers' actions "shock[ed] the conscience" and thus violated the plaintiffs' Fourteenth Amendment rights. *Id.* at 1057.

Defendants concede the deliberate indifference standard applies here. "Deliberate indifference occurs when the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Solis v. Cnty. of Los Angeles*, 514 F.3d 946, 957 (9th Cir. 2008) (cleaned up). The basis for Plaintiffs' claim appears to be the same as for the preceding claims—Deputy Ordaz failed to "call in more qualified help," did not use her time "ensuring Bertagnolli's safety," and instead "spent [it] exacerbating his suicidality, including the use of excessive force, and subject of the 'deliberate indifference' of Ordaz." (Dkt. No. 91 at 24-25.)

Even if drawing all inferences in Plaintiffs' favor, a reasonable trier of fact could conclude Deputy Ordaz's conduct in this regard was deliberately indifferent to a serious risk of harm to Mr. Bertagnolli, Deputy Ordaz would be entitled to qualified immunity. Plaintiffs have not identified any clearly established law which would have put Deputy Ordaz on notice her conduct violated Mr. Bertagnolli's substantive due process rights. *See Martinez v. City of Clovis*, 943 F.3d 1260, 1274 (9th Cir. 2019) (holding it is plaintiff's burden to demonstrate "the law was sufficiently well defined that every reasonable officer in the officers' shoes would have known that their conduct violated" plaintiff's substantive due process rights.).

\*\*\*

For the above reasons, the Court grants Defendants' motion for summary judgment on Plaintiffs' Section 1983 claims against Deputy Ordaz, claims one through six.

## II.    MONELL CLAIM

To state a claim for municipal liability under Section 1983, a plaintiff must allege: (1) the plaintiff was deprived of a constitutional right; "(2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (internal quotation marks and citation omitted). There can be no municipal liability without an underlying constitutional violation. *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994); *see also Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019) ("[A] municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled

United States District Court
Northern District of California

to immunity a constitutional violation might still have occurred.").

A municipal liability claim (often referred to as a *Monell* claim) can proceed under three theories of liability: "(1) when official policies or established customs inflict a constitutional injury; (2) when omissions or failures to act amount to a local government policy of deliberate indifference to constitutional rights; or (3) when a local government official with final policy-making authority ratifies a subordinate's unconstitutional conduct." *Brown v. Contra Costa Cty.*, No. C 12-1923 PJH, 2014 WL 1347680, at *8 (N.D. Cal. Apr. 3, 2014) (citing *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010)). Whichever theory is alleged, the plaintiff must demonstrate "the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900-01 (9th Cir. 2011); *see also City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985) ("At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."). Further, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Tuttle*, 471 U.S. at 823-24.

While Plaintiffs' Second Amended Complaint alleges *Monell* claims under each theory, they only oppose summary judgment as to their failure to train theory. Defendants are therefore entitled to summary judgment on claims eight and nine which are based on ratification and an unconstitutional policy or practice, respectively. *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) ("a plaintiff has abandoned ... claims by not raising them in opposition to the defendant's motion for summary judgment.") (cleaned up).

To establish liability for failure to train, Plaintiffs must show a particular training deficiency was so egregious it "amount[ed] to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Here, Plaintiffs contend "the Sonoma County Sheriff's Office failed to properly train Deputy Ordaz in Crisis Intervention and she failed to employ proper Crisis Intervention procedures during Bertagnolli's incident." (Dkt. No. 91 at 25.) Plaintiffs also insist the County was deliberately indifferent in retaining Deputy Ordaz given her "failures in officer safety and prisoner control

during her training programs." (*Id.*)

As a threshold matter, Plaintiffs cite no evidence to support any of their arguments. While they refer to Deputy Ordaz's training records, her "Daily Observation Report," portions of other officers' body camera footage "criticizing Deputy Ordaz for her interactions," and "Sonoma County Sheriff's Office Policy section 409: Crisis Intervention Incidents," Plaintiffs do not support their arguments with a single citation to the record. (Dkt. No. 91 at 25-26.)  It is not the Court's task to "scour the record" in search of evidence to support Plaintiffs' claims; instead, it is Plaintiffs' burden to ensure their opposition identifies the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted).  Nor does the evidence the Court has reviewed support Plaintiffs' arguments.

First, the record does not show a pattern of similar incidents involving Deputy Ordaz or other members of the Sonoma County Sheriff's Office. (Dkt. No. 94-1, Obayashi Depo. 82:23-83:11) (testifying he was unaware of an occasion when Deputy Ordaz or another Sonoma County Sheriff's Office staff member lost physical control or custody over a restrained individual allowing that individual to escape custody).  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (cleaned up).  "While deliberate indifference can be inferred from a single incident when 'the unconstitutional consequences of failing to train' are 'patently obvious,' an inadequate training policy itself cannot be inferred from a single incident." *Hyde v. City of Willcox*, 23 F.4th 863, 874–75 (9th Cir. 2022) (quoting *Connick*, 563 U.S. at 61).

Second, Plaintiffs' reliance on 2014 training records is insufficient given it is undisputed Deputy Ordaz successfully completed Field Officer Training, as well as the Crisis Intervention Academy, prior to returning to patrol in 2018. (Dkt. No. 86-1, Ex. B, Ordaz Depo. 53:12-54:22; Dkt. No. 86-2, Ex. P, ECF at 190.)  While Plaintiffs' written opposition contends Deputy Ordaz received at least 38 "unacceptable" ratings during her 2018 field officer training, the opposition does not cite to the particular portions of the training records alleging containing these ratings. (Dkt. No. 91 at 13, 25.)  Deputy Ordaz's training records (Ex. S) are 69-pages long.  (Dkt. No.

92.)  As noted above, it is not the Court's obligation to scour the record to find the evidence supporting the argument.  *Keenan*, 91 F.3d at 1279.  But, even if the record contains this evidence, it is undisputed Deputy Ordaz successfully completed the field officer training program and POST recertification process.  While Plaintiffs' expert Mr. Obayashi attests "[p]er best industry standards, Deputy Ordaz should not have successfully completed her FTO program," he does not identify these industry standards.  (Dkt. No. 91-3, Obayashi Decl. at ¶ 14.)  Mr. Obayahi's unsupported opinion is unreliable.  *See* Fed. Rules Evid. 702 and 703; *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 590 (1993) ("Reliable [expert] testimony must be grounded in the methods and procedures of science and signify something beyond 'subjective believe or unsupported speculation.'").

Third, the training records do not support Plaintiffs' argument the Sonoma County Sheriff's Office failed to properly train Deputy Ordaz in crisis intervention.  To the contrary, the training records confirm Deputy Ordaz completed crisis intervention training (CIT) less than five months before the incident.  (Dkt. No. 86-2, Ex. P, ECF 188, 190; Dkt. No. 94-1, Obayashi Depo. at 77:13-78:13; 79:9-15.)  Plaintiffs have offered no evidence this training program was inadequate.

Fourth, Plaintiffs' contention Deputy Ordaz's "conduct was in contradiction of Department policies, exhibiting her woefully inadequate training" is unsupported by the record.  (Dkt. No. 91 at 26.)  Plaintiffs identify Sonoma County Sheriff's Office Policy 409 and rely on the following provisions of the policy:

> Deputies should consider that taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis" and "[r]equest available backup deputies and specialized resources as deemed necessary and, if it is reasonably believed that the person is in a crisis situation, use conflict resolution and de-escalation techniques to stabilize the incident as appropriate.

(Dkt. No. 91 at 26; Dkt. No. 91-3 at 13, 14.)  Plaintiffs argue "Deputy Ordaz and the Sonoma County Sherriff's [sic] had ample opportunity and time to request CIT or the hostage negotiator department and wait for its arrival and did neither for any justifiable reason per its own policy." (Dkt. No. 91 at 26.)  But nothing in the policy requires officers to contact the hostage negotiator

department or a crisis intervention team (should one exist).

Finally, Plaintiffs' argument Deputy Ordaz violated the policy when she "positions herself with her hands on her hips in a stance that is commonly perceived as challenging and standing one's ground" which "would serve to only further aggravate one in Bertagnolli's mental condition" is unsupported.  (Dkt. No. 91 at 26.)  Plaintiffs do not identify when in the 30-plus minute encounter Deputy Ordaz stood with her hands on her hips and the Court's review of the video evidence does not show what Plaintiffs describe.

In sum, Plaintiffs have not identified evidence that would support a finding of a particular training deficiency so egregious it "amount[ed] to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388.  Instead, Plaintiffs rely on Mr. Bertagnolli's death alone to argue the training program amounted to deliberate indifference.  But, "an inadequate training policy itself cannot be inferred from a single incident." *Hyde v. City of Willcox*, 23 F.4th 863, 875 (9th Cir. 2022).  Defendants are therefore entitled to summary judgment on Plaintiffs' *Monell* failure to train claim.

***

Accordingly, Defendants are entitled to summary judgment on all of Plaintiffs' section 1983 claims.

### III.   STATE LAW CLAIMS

Plaintiffs also bring state law claims for battery, negligence, negligent infliction of emotional distress, and violation of the Bane Act, Cal. Civ. Code § 52.1.  Having granted summary judgment on all of Plaintiffs' federal claims, the Court, in its discretion, declines to assert supplemental jurisdiction over the remaining state law claims against Deputy Ordaz and the County. "A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Sanford v. MemberWorks, Inc*., 625 F.3d 550, 561 (9th Cir. 2010) (quoting 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v.*

1    *Cohill*, 484 U.S. 343, 350 n.7 (1988).

2            The Court declines to assert supplemental jurisdiction, finding, after considering judicial

3    economy, convenience, fairness, and comity, the balance of the factors weighs toward dismissing

4    without prejudice the remaining state law claims. Plaintiffs' remaining state law claims require

5    analysis into specific state law and are not resolved by the dismissal of Plaintiffs' federal claims.

6    Both the Ninth Circuit and California Supreme Court have held California's state negligence law,

7    as applied to excessive force cases, is broader than Fourth Amendment law. *See Hayes v. Cnty. of*

8    *San Diego*, 57 Cal. 4th 622, 639 (2013) ("[S]tate negligence law, which considers the totality of

9    the circumstances surrounding any use of deadly force ..., is broader than federal Fourth

10   Amendment law, which tends to focus more narrowly on the moment when deadly force is used.")

11   (cleaned up); *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1128 (9th Cir. 2021)

12   ("California negligence law overall is 'broader than federal Fourth Amendment law' in excessive

13   force cases.") (citing *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 (9th

14   Cir. 2016)). Plaintiffs' state law claims also implicate state law immunities. Given no federal

15   claims remain, the Court declines to decide these issues of purely state law. *See also Tabares*, 988

16   F.3d at 1131 n.7 (explaining, after reversing a district court's grant of summary judgment to the

17   defendant on the plaintiff's state negligence claim "[t]he district court is free on remand to decline

18   to exercise supplemental jurisdiction over the state-law claim[ ] and allow plaintiff[ ] to bring [it]

19   in state court," because the district court had previously dismissed the only federal claim) (cleaned

20   up). *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668–69 (9th Cir. 2019) ("We note,

21   however, that because we affirm the dismissal of plaintiffs'" federal "claims, the district court is

22   also free on remand to decline to exercise supplemental jurisdiction over the state-law claims and

23   allow plaintiffs to bring them in state court."); *Trustees of Constr. Indus. & Laborers Health &*

24   *Welfare Tr. v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 926 (9th Cir. 2003) ("It is

25   thus no surprise that our cases upholding the exercise of discretion under § 1367(c)(3) have all

26   involved dismissals for failure to state a claim or a grant of summary judgment to the defendant on

27   the federal claim... In each case, we held that it was appropriate for the district court to decline

28   jurisdiction over the supplemental state claims because the federal claim had proven to be

United States District Court
Northern District of California

unfounded.").

So, the Court dismisses Plaintiffs' remaining state law claims without prejudice.

**CONCLUSION**

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment in part.  Summary judgment is granted on the Section 1983 claims as to all Defendants, and on the state claims as to Sheriff Essick as it is undisputed he did not participate in the incident. The state law claims are otherwise dismissed without prejudice.

Plaintiffs' unopposed administrative motion to seal is GRANTED.  (Dkt. No. 92.)

**IT IS SO ORDERED.**

Dated: April 10, 2024

JACQUELINE SCOTT CORLEY
United States District Judge